IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> JEREMY JENSEN, <br><br> Defendant. | CR. NO. 22-00002 JAO <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS [ECF NO. 45]** |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS [ECF NO. 45]**

Before the Court is Defendant Jeremy Jensen's ("Jensen") Motion to Suppress Evidence and Statements ("Motion"). ECF No. 45. In the Motion, Jensen seeks suppression of evidence recovered subsequent to his arrest, and in particular evidence recovered pursuant to search warrants authorizing searches of a backpack and vehicle following canine sniffs. He also asks the Court to suppress statements he made to law enforcement. For the following reasons, the Court DENIES the Motion.

**PROCEDURAL BACKGROUND**

Jensen filed the Motion on June 13, 2022. ECF No. 45. The Government filed a Memorandum in Opposition on July 5, 2022. ECF No. 63. Jensen filed a Reply on July 13, 2022, ECF No. 84, and the Court held an evidentiary hearing on

1

July 14, 2022, ECF No. 89. By way of an entering order on July 15, 2022, the Court denied the Motion, *see* ECF No. 91, indicating that a formal order would follow.

## FINDINGS OF FACT

Unless otherwise indicated, the Court found the witnesses credible, with some witnesses having better memories than others.

On October 12, 2021, housekeeping staff at the Royal Kona Resort ("the hotel") entered Room 559 ("the room") to clean it but discovered signs that people had been smoking in the non-smoking room. A hotel security officer entered the room and saw what he believed to be, based on his own personal experience, signs of methamphetamine usage. He called the Hawaii County Police Department ("HCPD") and took a photo of the suspected drugs. No guests were in the room when the hotel staff entered it.

Officer Adam Cho arrived at the hotel and was informed by the hotel security officer that the hotel wanted the guests of the room trespassed. The security officer reported that the room was rented to a woman named Theresa Chandler, and that "Jay Jensen" was registered as a guest in the room. The hotel security officer who had entered the room showed Officer Adam Cho the photo he had taken of the suspected drugs in the room, which depicted a white crystalline substance on what Officer Adam Cho described as an "ottoman" between the beds,

watches, and a water bottle.  Officer Adam Cho contacted Officer Kyle Hirayama to report what he had learned, including the names of the renter and registered guest of the room.  Officer Hirayama has 16 years of experience with HCPD, including serving six years as a vice/narcotics officer.  Officer Hirayama instructed Officer Adam Cho to prevent anyone from entering the room.  Officer Adam Cho then secured the room, and sat outside of it from 10:30 a.m. until vice officers arrived at 3:30 p.m. to execute a search warrant for the room.  No one entered the room while the officer guarded it.

One of the hotel staff did her own investigative work and found a photo of Jensen on a Facebook page.  She showed Officer Adam Cho the Facebook photo of Jensen and explained that he was the registered guest to the room.  Officer Adam Cho had prior contact with Jensen, and so believed that the "Jay Jensen" registered as a guest to the room was in fact Defendant Jensen.

After the search warrant was approved by a judge, Officer Hirayama conducted a briefing of those officers who would be involved in the search warrant execution.  During the briefing, he told the other officers the names of the people registered to the room (Chandler and Jensen), both of whom were known to HCPD due to prior police contacts with them.  He also showed the officers photos of Chandler and Jensen.  Before the search warrant was executed, hotel staff informed

Officer Hirayama that another woman — Napua Galletes — had tried to access Room 559 a day or two prior.

Detective Darren Cho, who has 17 years' experience as an HCPD police officer, spent time as a detective in the vice unit, received additional narcotics investigation training, and is currently assigned to the criminal intelligence unit, assisted in the search. Detective Darren Cho has engaged in at least 50 drug-related cases, and was familiar with both Chandler and Jensen from prior contacts. He described Jensen as a known drug dealer.

During the search of the room, Officer Hirayama found two glass smoking pipes with bulbous ends, a clear plastic bag with a white crystalline substance, and a butterfly knife. Officer Stephen Kishimoto also assisted in the execution of the search warrant and observed that both glass pipes had been used. Detective Darren Cho testified that the white substance was found in between the two beds on a nightstand. To the extent that his testimony differs from that of Officer Adam Cho, who said that the drugs were on an "ottoman" in the photo he was shown, the Court finds Detective Darren Cho's memory more accurate as what he witnessed was in person. The white substance later tested as methamphetamine. It is undisputed that possession of the pipes, suspected methamphetamine, and butterfly knife are all arrestable offenses in Hawaiʻi.

After processing the room for evidence, Officer Hirayama took the evidence to the police van, which was driven by Officer Kishimoto, who had also assisted in the search of the room. Officer Sidra Brown was the front seat passenger and Officer Hirayama sat in the back. As the van headed out, hotel security staff contacted the police and told them that the people registered to the room had been driving a white Mercedes, and that a white Mercedes was passing by the hotel.

The white Mercedes was then seen driving on Kahakai Road, and Officer Kishimoto followed in the police van. The Mercedes then turned around and drove in the direction of the police van, driving past it. The officers in the van could not see the occupants of the Mercedes.

Officer Hirayama asked Officer Adam Cho, who by then was in the vicinity of the hotel parking lot and wearing a police uniform, to see if he could locate the Mercedes. He also instructed Detective Darren Cho, who had already left, to return to the hotel to assist in looking for the guests registered to the room. Officers Hirayama, Kishimoto, and Brown returned to the hotel grounds to see if they could identify who drove the Mercedes. Officer Adam Cho was the first officer who found the Mercedes in the parking lot, but by the time he reached it, no one was in it.

Detective Darren Cho returned to the hotel and parked in the hotel roundabout, and then walked toward Lagoon Tower to see if he could find

Chandler and Jensen. *See* Exhibit 1. While he walked on a breezeway, he looked up to Room 559, but did not see anyone at or near the door of the room. He then decided to return to the hotel's main lobby, and encountered the hotel's housekeeping manager on the north side of Lagoon Tower.

    Detective Darren Cho overheard the housekeeping manager speaking on the phone, reporting to someone that the parties involved were trying to get back into Room 559. The detective introduced himself to her, and the housekeeping manager told him that the parties were back at the hotel. At the same time, a man and a woman walked past, and she pointed them out to Detective Darren Cho as the ones who had tried to get back into the room. *See* Exhibit 2. Detective Darren Cho explained that the couple was four to five feet away from him at the time, walking toward Kahakai Road in the direction of the parking lot. The detective immediately recognized the male party as Jensen, but noted that the woman was not Chandler.

    Detective Darren Cho then told Officer Adam Cho that the suspect was moving in his direction, wearing all white and carrying a red and black backpack on his left shoulder. He followed the couple, witnessed Officers Hirayama and Adam Cho walk in Jensen's direction, and saw the woman and Jensen part ways near the northeast corner of Lagoon Tower, with Jensen continuing toward the parking lot.

Between the parking lot and the sidewalk where Jensen and the woman were seen walking was a lava rock wall that was about two feet high. After the woman walked away from Jensen, Jensen crossed over the rock wall toward Kahakai Road. After Detective Darren Cho watched as officers walked in Jensen's direction to make contact with him, the detective followed the female and contacted her. He identified himself and asked her to sit down. When he looked back to see where Jensen was, he noted that other officers were with him and also saw the backpack at the foot of the rock wall, in a plant bed between the sidewalk and the wall. *See* Exhibit 3.

Officer Hirayama was one of the officers who approached Jensen near Kahakai Road.[1] He told him, "Hey Jeremy, I need to talk to you." The two converged toward each other. Officer Hirayama asked Jensen where he was coming from; he responded that he was locked out of his hotel room, Room 559, and was going to his car. The officer asked him which car was his, and he responded that his car was a white Mercedes. Officer Adam Cho walked up and, at the direction of Officer Hirayama, placed Jensen in handcuffs at that point, and

---

[1] There was inconsistent testimony between Officers Adam Cho and Hirayama regarding how it was that the police contacted Jensen. The Court finds Officer Hirayama's version more credible based on a number of factors, including his demeanor and the detailed nature of his description. The Court does not find Officer Adam Cho incredible; rather, it appeared that his memory of the events was not as crisp as Officer Hirayama's.

Jensen was told to sit down. Jensen's arrest occurred at about 4:20 p.m. Shortly thereafter, Officer Adam Cho saw Chandler in the vicinity and arrested her.

Officer Kishimoto then returned to the police station to obtain police canine Rory. He drove with Rory back to the hotel. Officer Kishimoto conducted a pre-screen of an area near the backpack to confirm the area did not contain the odor of narcotics. He then moved the backpack several feet to the pre-screen area before conducting the canine screen. At approximately 4:58 p.m., Rory indicated that there was the presence of the odor of narcotics on the exterior of the backpack. Officer Kishimoto then took Rory to the Mercedes and conducted a canine screen at about 5:15 p.m., or 55 minutes after Jensen's arrest. This and other information was used to obtain search warrants for the backpack and the Mercedes, which were executed the following day.

One discrepancy regarding Officer Kishimoto's reports was that he had described the pre-screen as a "clean and sweep," but, while testifying, Officer Kishimoto denied ever using that term. He testified that one possible reason why the term "clean and sweep" showed up in reports that were submitted to the state prosecutor's office was that he had dictated the report but did not review the report before it was sent to that office. He had reviewed what was sent to the federal government in advance, and those reports did not contain the words "clean and

sweep." The Court found this explanation reasonable and credible, based on his reaction to the questions on cross examination.

There was also a challenge to the fact that Jensen's booking sheet contained a panoply of charges, including drug trafficking related charges, and was dated October 12, 2021, even though the search warrants of the Mercedes and backpack were not executed until the following day. Prior to those searches, the police did not have probable cause to believe Jensen was involved in drug trafficking. The defense posited that, based on this, the officers must have lied about when they searched the backpack and Mercedes. In other words, the defense argues, the officers knowingly executed warrantless searches of the backpack and Mercedes on October 12, 2021, rather than searches pursuant to a warrant on October 13, 2021. But the Court finds the officers' explanations reasonable: the computer software allows officers to enter new charges based on subsequent investigation, and the date for those charges in this case was also October 12, 2021, because that was the date that Jensen was suspected of committing the crimes listed.

## **CONCLUSIONS OF LAW**

The Motion raises essentially three issues. First, was there was probable cause for the arrest of Jensen and, if not, was his detention unreasonably prolonged for the dog sniff? Second, assuming Jensen was lawfully arrested, was the detention of his backpack and Mercedes pending the dog sniffs a seizure that

required probable cause? Third, were Jensen's statements the product of a custodial interrogation?

### A. There Was Probable Cause For Jensen's Arrest

The Government does not appear to seriously dispute the contention that Jensen was under arrest at the moment he was handcuffed. The Court concludes that probable cause supported the arrest.

The Fourth Amendment's protection against unreasonable searches and seizures "'safeguard[s] the privacy and security of individuals against arbitrary invasions by government officials.'" *Carpenter v. United States*, 585 U.S. ___, 138 S. Ct. 2206, 2213 (2018) (citation omitted). "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citations omitted). If there was not, then the fruits of that arrest are inadmissible under the Fourth Amendment. *See Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963). The Government bears "[t]he burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement." *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012) (citation omitted).

The probable cause inquiry is not "reduc[ible] to a neat set of legal rules" and requires the Court to "examine the events leading up to the arrest, and then

decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotation marks and citations omitted).  Such examination must take into account the totality of the circumstances, and the determination of probable cause "turn[s] on the assessment of probabilities in particular factual contexts." *Florida v. Harris*, 568 U.S. 237, 244 (2013) (internal quotation marks and citation omitted).  If a single police officer does not have sufficient known facts, probable cause may rest upon a collective knowledge of all the officers involved in the investigation.  *See United States v. Del Vizo*, 918 F.2d 821, 826 (9th Cir. 1990).

    At the time Jensen was contacted by the police, HCPD was aware that he was one of two registered guests to Room 559, where evidence of three arrestable offenses was located.  Moreover, HCPD had been informed that he was trying to enter the room after the police had left the room after the search.  The defense attempts to make hay of the fact that:  (1) the only evidence of dominion and control over the room was a credit card receipt for the room in Chandler's name; (2) there was no evidence as to when Jensen was last in the room, if at all; and (3) another woman, Galletes, had attempted to access the room a day or two prior.  But those questions suggest a much stricter standard for probable cause than the law requires.  It does not take much common sense to reasonably believe that a person

who was one of two people registered to the room where police found a baggie of methamphetamine on the nightstand between the two beds in the room, as well as two smoking pipes, used at least one of the pipes and the methamphetamine. Add to that the fact that Jensen engaged in suspicious activity by dropping his backpack in a planter area shortly before police contacted him, and there is sufficient probable cause to conclude that he possessed at least one of the contraband items in Room 559. That the police suspected he was a drug dealer and had prior contacts with him further supports the probable cause to arrest. Considering the totality of the circumstances then, the Government has met its burden.

**B.     The Delay Between Jensen's Arrest And The Dog Sniffs Did Not Transform The Detention Of Jensen's Property Into Seizures Requiring Probable Cause**

Jensen essentially contends that the police unreasonably seized his backpack and the Mercedes while the police awaited the arrival of a narcotics detection canine and lacked probable cause to do so. The facts do not support the argument.

The Court first turns to the question of whether the circumstances leading up to the dog sniffs amounted to a seizure requiring probable cause.[2] The Supreme Court has explained that police can engage in a brief detention of property for further investigative purposes, analogous to a *Terry* stop:

---

[2] Jensen does not assert that there was not reasonable suspicion to warrant an investigatory detention of the property.

> [W]e conclude that when an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope.

*United States v. Place*, 462 U.S. 696, 706 (1983). The detention of the Mercedes and the backpack in this case was this very type — a "brief[]" one "to investigate the circumstances that aroused [officers'] suspicion[s]" — and therefore did not rise to the level of a seizure requiring probable cause.

When evaluating whether a detention of property is a seizure requiring probable cause, the Supreme Court has counseled courts to consider the duration and intrusiveness of the seizure. *See Place*, 462 U.S. at 702–03 (cases cited). In *Place*, the Court examined three factors determining whether an investigatory detention is reasonable: the amount of time, the continued diligence of the investigation, and the overall impact the detention has on the individual. *See id.* at 708 & n.8, 709; *see also United States v. $191,910.00 in U.S. Currency*, 16 F.3d 1051, 1059 (9th Cir. 1994).

Before turning to these factors, it is helpful to briefly review the facts of *Place*. There, the defendant had drawn the attention of law enforcement before he boarded a flight to New York. *See Place*, 467 U.S. at 698. Once he arrived at LaGuardia airport, his behavior only furthered agents' suspicions that he was involved in drug trafficking. *See id.* He did not consent to a search of his luggage,

13

so the agents informed him that they were going to obtain a search warrant for his luggage, and took his bags to Kennedy Airport for a canine sniff. That process took 90 minutes. *See id.* at 699. The Supreme Court held that the circumstances surrounding the warrantless seizure of the defendant's luggage did not fall under the *Terry* exception to the probable-cause requirement, and outlined the factors for courts to consider when determining whether a detention of property mandates probable cause.

1. **Length of Time**

The length of time of a detention of property affects the seizure analysis. "[T]he brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." *Id.* at 709.

Although the Supreme Court declined to adopt a bright line for when a momentary warrantless detention transforms into a seizure requiring probable cause, it held that 90 minutes is certainly beyond that line. *See id.* at 710. The Ninth Circuit expressed that this "hazy guidance" makes it difficult to determine just how much time it takes for a permissible detention to become an impermissible seizure. *United States v. Zavala-Serra*, 1988 WL 82830, at *2, 855 F.2d 864 (table) (9th Cir. Aug. 1, 1988). However, the Ninth Circuit somewhat clarified that line when it determined that a 45-minute detention of property prior

14

to a dog sniff did not amount to a seizure requiring probable cause. *See United States v. Erwin*, 803 F.2d 1505, 1509 (9th Cir. 1986).

Here, HCPD's canine arrived on the scene to sniff the backpack 38 minutes after Jensen was initially detained. This length of time is well within the 45-minute window the Ninth Circuit outlined. *See Erwin*, 803 F.2d at 1505. The sniff of the Mercedes occurred 17 minutes after the backpack sniff, but a total of 55 minutes after Jensen was initially detained. While the 55-minute window is closer to the permissible 45-minute window than the unreasonable 90-minute window, the Court must nonetheless consider any justifications for that length of time. *See Place*, 462 U.S. at 709; *Erwin*, 803 F.2d at 1505.

### 2.  Continued Diligence Of The Investigation

The justification for the length of detention should be evaluated by examining whether the police diligently pursued their investigation during the detention. *See Place*, 462 U.S. at 709. Courts allow for "common sense and ordinary human experience" to govern when looking for any delays that are unnecessary to the legitimate investigation. *See United States v. Sharpe*, 470 U.S. 675, 685 (1985). Longer detentions may simply be the result of a graduated response to the demands of a particular situation. *See id.* at 686 (quoting *Place*, 462 U.S. at 709 n.10).

In *Place*, the Court acknowledged the agents' lack of diligence, highlighting the ample time they had to prepare for the additional investigation while the defendant was on the flight to New York. *See Place*, 462 U.S. at 709. The Court assumed that the police could have arranged for a trained narcotics dog in advance because they knew of the individual's arrival time for several hours beforehand. *See Sharpe*, 470 U.S. at 685 (discussing *Place*). Additionally, the agents in *Place* only exacerbated the intrusion by failing to inform the defendant where his property was being taken, how long it would be gone, and how it would be returned. *See Place*, 462 U.S. at 710.

Here, 38 minutes after the officers arrested Jensen, they conducted a canine screen of the backpack. Just 17 minutes later, during which time the officers had arrested Chandler, Rory sniffed the Mercedes. Unlike the facts in *Place*, neither the backpack nor the Mercedes were removed from the scene, and the initial 38-minute delay was warranted by the need to obtain Rory and bring him to the hotel. During the 55 minutes between Jensen's arrest and the dog sniff of the Mercedes, officers discovered the backpack, arrested Chandler, and conducted a dog sniff of the backpack. As such, they were diligently pursuing the investigation during the detention of the property. *See Sharpe*, 470 U.S. at 685.

### 3. Impact of the Detention

Lastly, courts look at the overall impact of the investigatory detention on the individual. *See Place*, 462 U.S. at 708. In *Place*, the Court noted that the police conduct intruded on both the individual's possessory interest in the property as well as the liberty interest in proceeding with his itinerary. *See id*.

Here, unlike the individual in *Place*, *see id.*, Jensen was properly under arrest at the time his property was detained for investigation. *See supra* Part A. Because of his arrest, he was effectively unable to go anywhere or do anything with either the backpack or the Mercedes; in other words, the dog-sniffs did not cause Jensen's inability to leave with either the backpack or the Mercedes. Moreover, the Mercedes, located in the parking lot of the hotel, was in a public place. *C.f. Zavala-Serra*, 1988 WL 82830, at *3 (concluding that a dog-sniff of luggage after the completion of a trip, which "did not disrupt appellant's travel" and "which was located in a public place," did not violate the Fourth Amendment). Nor does it seem that anyone else was affected by the seizure of the property and thus, the 55-minute detention had minimal impact on Jensen's Fourth Amendment rights.

At the hearing, Jensen contended that the canine officer illegally moved the backpack immediately prior to the canine sniff when he took the backpack and placed it in the nearby pre-screened area. So, he argued, the officer illegally seized

it. There are two problems with this argument. First, Jensen arguably abandoned the backpack and no longer had a reasonable expectation of privacy in the backpack in any event. *See Abel v. United States*, 362 U.S. 217, 241 (1960); *United States v. Jackson*, 544 F.2d 407, 409 (9th Cir. 1976) ("Abandonment is primarily a question of intent, and intent may be inferred from words, acts, and other objective facts." (citations omitted)). Second, the fact that the backpack was moved a short distance does not appear to affect the analysis here. Unlike the facts in *Place*, it was not removed from the scene, and only moved several feet away for the purposes of ensuring a canine screen uninfected by other potential odors of narcotics.

**C.     Jensen's Statements To HCPD Were Voluntary**

Jensen seeks to suppress his statements to HCPD made at the scene of his arrest. Because the Government does not intend to offer these statements its case-in-chief, the Court need only consider whether the statements were made voluntarily.

"Courts that address this issue look at factors such as the declarant's state of mind, the physical environment in which the statement was given, and the manner in which the declarant was questioned." *Pollard v. Galaza*, 290 F.3d 1030, 1033 (9th Cir. 2002) (citation omitted). Applying these considerations, Jensen was freely walking when the officers approached him and asked him questions about

18

where he was coming from and where he was going.  While there may have been several officers around at the moment, the surroundings of the setting — an open parking lot — weigh against a conclusion that Jensen made a statement against his will.  The nature of the questions were not accusatory.  Because the statements were voluntary, the Government may use Jensen's statements in its cross-examination of Jensen should he testify, or in rebuttal.  *See id*.

## CONCLUSION

For the foregoing reasons, the Motion is DENIED.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai'i, August 3, 2022.



Jill A. Otake
United States District Judge

CR 22-00002 JAO, *United States v. Jensen*; FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS [ECF NO. 45]